**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **SHAWNTEL M. J.,**[1] | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | ) **Case No. 3:20-CV-513-MAB**[2] |
| | ) |
| **COMMISSIONER OF SOCIAL** | ) |
| **SECURITY,** | ) |
| | ) |
| **Defendant.** | |

## MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff Shawntel M. J. is before the Court, represented by counsel, seeking review of the final decision of the Commissioner of Social Security denying her applications for Disability Insurance Benefits (DIB) under Title II of the Social Security Act and Supplemental Security Income (SSI) under Title XVI of the Act. For the reasons set forth below, the Commissioner's decision is reversed and this matter is remanded for rehearing and reconsideration of the evidence pursuant to sentence four of 42 U.S.C. § 405(g).

### PROCEDURAL HISTORY

Plaintiff protectively filed applications for DIB and SSI benefits on June 16, 2017, alleging disability as of February 3, 2017 due to problems with both knees, a herniated

---

[1] In keeping with the Court's practice, Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. *See* Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c) (Doc. 10).

disc in her back, bladder problems, and arthritis (Tr. 67, 77). Her claims were denied initially and upon reconsideration in November 2017 (Tr. 75–76, 85–86, 98–99, 109–10). Plaintiff requested a hearing by an Administrative Law Judge, which was held in April 2019 (Tr. 34–66). Following the hearing, ALJ Nathaniel Plucker issued an unfavorable decision dated June 17, 2019 (Tr. 12–33). Plaintiff's request for review was denied by the Appeal's Council, and ALJ Plucker's decision became the final agency decision (Tr. 1). Plaintiff has exhausted her administrative remedies and has filed a timely complaint in this Court seeking judicial review of the ALJ's adverse decision.

## APPLICABLE LEGAL STANDARDS

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes and regulations.[3] Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a claimant is disabled, the ALJ considers the following five questions in order. 20 C.F.R. § 416.920(a)(4). The first question is whether the claimant is presently engaged in substantial gainful activity? *Id.* If the answer is yes, then the claimant is not disabled regardless of their medical condition, their age, education, and

---

[3] The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, *et seq.*, and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, *et seq.*, and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes and regulations are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, of the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

work experience. *Id.* at § 416.920(a)(4)(i), (b). If the answer is no, and the individual is not engaged in SGA, the analysis proceeds to question two. *Id.* at § 416.920(a)(4).

At question two, the ALJ considers whether the claimant has a medically determinable physical or mental impairment, or a combination of impairments, that is "severe" and expected to persist for at least twelve months? 20 C.F.R. § 416.920(a)(4)(ii), 416.909. If the answer is no, then the claimant is not disabled. *Id.* at § 416.920(c). If the answer is yes, the analysis proceeds to question three. *Id.* at § 416.920(a)(4).

At question three, the ALJ must determine whether the claimant's severe impairments, singly or in combination, meet the requirements of any of the "listed impairments" enumerated in the regulations. 20 C.F.R. § 416.920(a)(4)(iii). *See also* 20 C.F.R. Pt. 404, Subpt. P, Appendix 1. (list of impairments). A claimant who meets the requirements of a "listed impairment" is deemed disabled. 20 C.F.R. § 416.920(d). For claimants who do not meet the requirements of a "listed impairment," the ALJ must then determine the claimant's residual functional capacity ("RFC"). *Id.* at § 416.920(e). A claimant's RFC is simply the most the claimant can still do despite their functional limitations and restrictions caused by their physical or mental impairments. 20 C.F.R. § 404.1545(a)(1).

Then at step four, the ALJ must determine whether the claimant retains the RFC to continue performing their past work. 20 C.F.R. § 416.920(a)(4)(iv). If the answer is yes, then the claimant is not disabled. *Id.* at § 416.920(a)(4)(iv), (f). If the answer is no, the analysis proceeds to the fifth and final step, where the burden shifts to the commissioner to show whether, based on the claimant's RFC, there are sufficient numbers of other jobs

in the local or national economy that the claimant can perform. *Id.* at § 416.920(a)(4)(v). If the answer is yes, then the claimant is not disabled. *Id.* at § 416.920(g). If the answer is no, the claimant is found disabled. *Id.*

It is important to recognize that the scope of judicial review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether Plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial evidence as, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted). In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010). "[W]e will reverse only if the record compels a contrary result." *Deborah M. v. Saul*, 994 F.3d 785, 788 (7th Cir. 2021) (citation and internal quotation marks omitted).

### THE ALJ'S DECISION

ALJ Plucker followed the five-step analytical framework outlined above (Tr. 12–33). At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful

activity since the alleged disability onset date (Tr. 17–18). More specifically, she had worked but they were unsuccessful work attempts because there were significant breaks preceding the work activity, it lasted for less than six months, and it ended due to her disability.

At step two, the ALJ found that Plaintiff had the severe impairments of lumbar degenerative disc disease, knee osteoarthritis, bladder control issues, obesity, and mild hearing loss (Tr. 18–19).

At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (Tr. 20–21). The ALJ found that Plaintiff has the residual functional capacity (RFC) to perform sedentary work as defined in 20 C.F.R. 404.1567(a) and 416.967(a) with the following limitations:

> the claimant cannot climb ladders, ropes, or scaffolds, and can only occasionally climb ramps and stairs. She can occasionally balance and occasionally stoop, kneel, and crouch, but can never crawl. The claimant should avoid exposure to hazards such as unprotected heights and moving or dangerous machinery. She is limited to work in a moderate noise environment as defined in the Selected Characteristics of Occupations. She will take up to six minutes of bathroom breaks per hour as needed outside of normal breaks.

(Tr. 21–26).

At Step 4 and 5, based on the testimony of a vocational expert, the ALJ found that Plaintiff was unable to perform any past relevant work but she was not disabled because she was able to do other jobs that exist in significant numbers in the national economy (Tr. 26–28).

<u>ISSUES RAISED BY PLAINTIFF</u>

1. The ALJ failed to consider all of Plaintiff's diagnoses at Step 2, namely patellofemoral syndrome in her knees, which meant that the ALJ erred by failing to assess the combined severity of all of her impairments;

2. The ALJ mischaracterized Plaintiff's use of a cane;

3. The ALJ failed to properly evaluate Plaintiff's inability to balance;

Plaintiff argues that these errors, in turn, tainted the ALJ's RFC determination because it does not incorporate all of her impairments and limitations.

<u>THE EVIDENTIARY RECORD</u>

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by Plaintiff.

**A.  Plaintiff's Disability Allegations**

Plaintiff submitted a number of forms to the Social Security Administration, including a Work History Report and a Function Report (Tr. 238–56). She also testified at an evidentiary hearing in front of ALJ Plucker in April 2019 (Tr. 34–65). The following is a summary of Plaintiff's allegations regarding her disability as presented on the agency forms and at the evidentiary hearing.

Plaintiff was born in 1976 and was 40 years old on the alleged disability onset date of February 3, 2017. She is 5' 2" tall and weighs around 200 pounds.

She has a herniated disc in her back that causes constant, severe pain (Tr. 48, 246). It is difficult for her to get out of bed, and sometimes she needs help doing so (Tr. 48, 246). She said she "can't really stand straight" (Tr. 48).

Plaintiff also has bladder issues (Tr. 48, 246). She had a stimulator implanted to help but even when it's functioning as well as it possibly can, she still has to go to the restroom at least two times an hour (Tr. 48, 60, 246). Other times, she goes to the restroom five or six times in an hour (Tr. 256).

She has problems with both knees, which cause her "constant pain" (Tr. 48, 246). She had surgery on her right knee many years ago (Tr. 52). She said the orthopedic surgeon told her at the time that both knees were "bone-on-bone, no cartilage, arthritis" and that she would eventually need both knees replaced (Tr. 49, 52–53). She said she should have also had surgery on her left knee as well but she could not afford to take off work again (Tr. 53).

Plaintiff testified that her legs constantly give out on her and her knees "lock up" (Tr. 49, 51, 248, 251). "Like I go to take a step and my - - my knees lock up on me and I'm having to grab onto something to keep from falling, just a lot of pain" (Tr. 51). She claims she is too young for a knee replacement, so "nobody wants to - - is going to do it" (Tr. 49). She now walks with a cane (Tr. 49). Plaintiff said she has done different types of physical therapy, acupuncture, and aquatic therapy to help manage her back and knee pain (Tr. 49). Plaintiff also testified "I'm constantly losing my . . . balance. . . . I'm constantly falling out of the shower because I'm just losing my balance." (Tr. 49).

When asked to describe her day, she said she wakes up and takes a shower (Tr. 247). Takes her wife to work. Then goes to the library or back home to get on the computer and look for jobs. She said she used to run and play sports (Tr. 247). And she worked a variety of jobs, including work as a truck driver and over ten years as a police officer and

a security officer (Tr. 238; *see also* Tr. 26). But she said now she "can't sit a long time" and "can't stand for a long time" (Tr. 49; *see also* Tr. 247, 248).

Plaintiff said when her back pain is severe and her knees lock up, her wife has to dress her, bathe her, take care of her hair, and even help her get off the toilet (Tr. 247). She said she prepares a meal once a week, but it is difficult because her back pain is so severe, and her knees go out on her and she falls (Tr. 248, 255). She is able to do "some laundry" because the laundry room is close by in her bedroom, and she can also iron while sitting (Tr. 248). She goes to the grocery store with her wife and rides on the motorized cart (Tr. 249). She no longer goes to the movies or the bowling alley (Tr. 250). She tries to go to church every Sunday if she feels alright but does not do anything there other than sit and go to the restroom (Tr. 249). Sometimes her pain is so severe, she cannot get comfortable and just wants to be left alone (Tr. 249).

She said she cannot lift too much because her back pain is too severe (Tr. 251). Squatting, bending, kneeling, and stair climbing is "unbearable" because of her knee pain (Tr. 251).

### B. Medical Records

Plaintiff reported bilateral knee pain as far back as 1999 (Tr. 353, 355). She underwent a right knee arthroscopy in 2005 or 2006 (*see* Tr. 352, Tr. 366). There is no imaging from this time or records pertaining to this surgery.

From 2015 through 2019, Plaintiff received medical care related to her knees from her primary care physician, Dr. Anthony Truong, at Family Medicine Fairview Heights, as well as a number of practitioners at the VA.

In December 2015 Plaintiff saw Dr. Truong, where she complained of a number of issues, including pain in both knees (Tr. 366–69). She described the pain in her knees as a dull ache, non-radiating pain, along joint line, and when bending. But she had no pain that particular day. On examination, her knees had full range of motion, "no laxity" (meaning loose ligaments), "no TTP" (meaning tenderness to palpation), and no swelling. Dr. Truong ordered x-rays of both knees, and the results were "unremarkable" (Tr. 370–71). There was no osteophyte formation (or bony lumps), no swelling, no fracture or dislocation, and no gross soft tissue abnormality (*Id.*).

In February 2016, Plaintiff had a consultation with a physical therapist at the VA following a referral for her lower back pain (Tr. 1046–47; *see also* Tr. 1007–08). She reported, in pertinent part, that her pain was primarily localized to her lower back but also radiated down the backs of both legs at times. She reported no pain at that particular moment, but indicated pain at a seven or eight within the past week. The therapist noted that Plaintiff had full range of motion in both knees. The plan was for Plaintiff to have physical therapy once a week for one to two months. She attended three sessions (February 24th, March 2nd, and March 9th) (Tr. 1083–87), and then switched to aquatic physical therapy (Tr. 1081–83). She attended six sessions of aquatic therapy (March 15th, March 21st, April 11th, April 18th, May 2nd, and May 16th), some of which included leg strengthening exercises and work on her gait (Tr. 1068–81). During the first session, she reported that "pain comes and goes, not always a constant pain" (Tr. 1081). By the third session, she stated she was "having very little back pain" (Tr. 1076), and at the fourth and fifth sessions, she had "no pain at all" (Tr. 1070–73, 1073–74). At the sixth and final

session, she reported being "very stiff," but acknowledged that her "pain overall has improved since starting therapy" (Tr. 1048). Her therapy was discontinued following this appointment, with a note indicating "goals met" (Tr. 1048).

In August 2016, Plaintiff attended an orientation session for the Interdisciplinary Pain Rehabilitation Group (Tr. 459–60, 1001–02). The note indicated that Plaintiff would be scheduled for an evaluation by the team at the Pain Rehabilitation Center to consider placing her in the group program (*Id.*). There is no indication in the records that Plaintiff followed through with the evaluation. That same month, Plaintiff also attended an orientation session for MOVE!, a weight loss program (Tr. 454–55). Plaintiff declined to participate in the program at that time, saying she was "not interested." She also attended a recreational therapy consultation (Tr. 450–52, 1052). Again, there is no indication that she followed through with this program.

At a urology appointment in November 2016, the nurse noted that Plaintiff presented "ambulatory" with a "steady gait" (Tr. 438). That same month, Plaintiff apparently saw her primary care physician at the VA, where she reported numbness in both legs but her sensory exam was normal (Tr. 431, 906). (This visit was mentioned in other notes, but the Court was unable to find notes from the visit itself.) She was referred to a rheumatologist for a possible rheumatological issue, such as an autoimmune condition or connective tissue disease, and evaluated in December 2016 (Tr. 427–31, 562– 67). She reported, in pertinent part, neuropathy in both legs, burning in her left foot, pain in her left heel when standing or walking, and that her left leg gives out. She also complained of "arthralgias that are sporatic [sic] with some joint stiffness." On

examination, she had full strength in her extremities, normal reflexes, and "normal gait." The rheumatologist ordered further testing, which showed a low probability of rheumatologic disorders, recommended a potential referral to neurology for further evaluation of neuropathy in both of her legs.

A nurse's note from July 2017, indicates that Plaintiff complained of worsening back pain for a week but Plaintiff "presented ambulatory with steady gait" (Tr. 402). In mid-August 2017, Plaintiff had a consultation with a chiropractor at the VA for back pain (Tr. 525-29, 993–996). The chiropractor noted that Plaintiff was "in no apparent distress" and "walk[ed] with no difficulty" (Tr. 994). Because Plaintiff arrived late to the appointment, the chiropractor did not treat her and said treatment would begin at the next visit (Tr. 996). Plaintiff received four treatments (September 18, October 2, and December 15, 2017, and January 22, 2018) (Tr. 997–1001). At the final appointment, she told the chiropractor that her back pain had been bad and it hurt to move. She acknowledged that treatment helps but said it was only temporary relief. The chiropractor noted that Plaintiff had no improvement in her condition. She talked to Plaintiff about diet and exercise, encouraged her to count carbohydrates, and explore yoga or tai chi. Plaintiff was "released from care."

At the end of August 2017, Plaintiff appeared for a consultative examination with Dr. Vittal Chapa (Tr. 473–78). She told Dr. Chapa that she had no cartilage in the knees, they are bone on bone. She also told him that she uses a "self-prescribed" cane on and off and had been using it the last two months. She also told him that sometimes her right leg gives out. On examination, Dr. Chapa noted that Plaintiff's right thigh was atrophied by

3cm compared to her left thigh but she had full motor strength in both legs. Her sensory exam was normal in both legs. She had full range of motion in all joints except her right hip and right knee. She had pain in range of motion with her right knee, and Dr. Chapa felt crepitation in both knees,[4] but both knee joints "appeared stable" without any redness or heat. Dr. Chapa noted that he asked Plaintiff to walk without the cane and "she appeared to have significant pain in the right knee without a cane." He further noted, "It appears from the examination that she needs a cane for ambulation."

Less than a week later, on September 5, 2017, Plaintiff called the VA and reported to a nurse that she was having increased weakness and pain in her legs (Tr. 524, 599). She said she was unable to distinguish whether it was due to pain radiating from her lower back or from the knees themselves. She further said that when she is walking, or sometimes just standing, her legs seem to give out and she has to grab onto something nearby to hold herself up. She recently started using a friend's cane. Plaintiff was scheduled to see her primary care physician on September 8th (Tr. 602–06).

The day before she saw her primary care physician, Plaintiff attended an acupuncture appointment at the VA for back and knee pain (Tr. 590). It does not appear she had any further acupuncture beyond that one treatment. On September 8th, Plaintiff reported an increase in back pain and knee pain (Tr. 602–06). She said her knee had been locking up and giving out. The doctor ordered x-rays of both knees and indicated she would refer Plaintiff for an orthopedic surgery consultation after the x-rays were

---

[4] Crepitus is the crackling, crunching, grinding, or grating noise that occurs when moving a joint. It can be a sign of arthritis, cartilage wear, or an injured joint. CEDARS SINAI, *Crepitus,* https://www.cedars-sinai.org/discoveries/crepitus.html (last visited Sept. 28, 2021).

complete. She also ordered a knee brace for Plaintiff and told Plaintiff to take NSAIDs as needed for pain.

The x-rays for both knees were taken later that same day and came back "negative" (Tr. 482–83). There were no fractures, dislocations, or bone destruction, and the joint spaces were normal with no evidence of osteoarthritis. Plaintiff also had a brief 15-minute physical therapy consultation, where she received instruction on how to use a cane (Tr. 592–93, 872). The therapist noted that Plaintiff "arrived ambulatory with a cane with antalgic gait pattern and decreased cadence."[5] Plaintiff received her hinged knee braces in early October 2017 (Tr. 1032)

She then met with an Advanced Practice Nurse in Orthopedics about her bilateral knee pain on October 11, 2017 (Tr. 856–59, 989–993). She told the surgeon that both of her knees catch and lock "all day." She rated her pain as a ten out of ten, on average. She said "everything" was an aggravating factor and "nothing" was an alleviating factor. She told the surgeon she had not had an MRI or injections and was not doing physical therapy or home exercises. On examination, the surgeon noted that Plaintiff's ambulation was "antalgic with cane, wearing bilateral bracing" (Tr. 991). There was no redness, swelling, warmth, lesions, or masses in either knee. And all of the manual tests done by the surgeon were negative (*i.e.*., Lachman's test, anterior drawer test, varus stress test, valgus stress

---

[5] An antalgic gait is an abnormal pattern of walking with a limp that is caused by pain. Nadja Auerbach, Prasanna Tadi, *Antalgic Gait in Adults,* https://www.ncbi.nlm.nih.gov/books/NBK559243/ (last visited Sept. 28, 2021). And cadence is the number of steps per minute. James O. Judge, *Gait Disorders in Older Adults,* https://www.merckmanuals.com/professional/geriatrics/gait-disorders-in-older-adults/gait-disorders-in-older-adults (last visited Sept. 28, 2021).

test), meaning her ligaments were all intact. However, she had tenderness in both knees along the patella joint line and crepitus was felt in both knees. Her range of motion was slightly diminished in both knees. (Extension in both knees was 10 degrees; full extension is 0 degrees. Flexion was 120 degrees in the right knee and 110 degrees in the left; full flexion is 140 degrees). Her strength in both legs was also diminished; she got a three out of five on both extension and flexion strength in both legs. The surgeon's impression of Plaintiff's problems was bilateral patellofemoral syndrome[6] and obesity. She recommended physical therapy, weight loss, icing and elevating, continued use of the knee braces, and topical diclofenac.[7]

On November 21, 2017, Plaintiff had a consultation with the Pain Rehabilitation Center (Tr. 861–66). She reported "pain all over her body," most of it in her back and knees. The physician noted that Plaintiff "ambulates unassisted, cautious, flat footed, wide bos." (the Court is unsure what "bos." stands for). Sensation in both legs was intact

---

[6] Patellofemoral syndrome is sometimes referred to as "runner's knee" and it is a broad term used to describe pain at the front of your knee, around your kneecap. Common symptoms include increased pain with activities like climbing stairs, running, jumping, and squatting, or sitting for long periods with a bent knee. Another common symptom is rubbing, grinding, or clicking sounds of the kneecap when bending and straightening your knee. It can be caused by overuse, injury to the kneecap, or muscle imbalance or weakness in the muscles around your hip and knee that, as a result, do not keep your kneecap properly aligned. Simple treatments, such as rest and ice, often help, but sometimes physical therapy is needed to ease patellofemoral pain. To prevent patellofemoral syndrome, it is essential to maintain muscle strength and lose excess weight. MAYO CLINIC, *Patellofemoral pain syndrome*, https://www.mayoclinic.org/diseases-conditions/patellofemoral-pain-syndrome/symptoms-causes/syc-20350792 (last visited Sept. 28, 2021); AMERICAN ACADEMY OF ORTHOPAEDIC SURGEONS, *Patellofemoral pain syndrome*, https://orthoinfo.aaos.org/en/diseases--conditions/patellofemoral-pain-syndrome/ (last visited Sept. 28, 2021).

[7] Diclofenac is a nonsteroidal anti-inflammatory drug (NSAID) that also comes in a topical form and is used to treat pain and other symptoms of arthritis, such as inflammation, swelling, stiffness, and joint pain. MAYO CLINIC, *Diclofenac (Topical Application Route)*, https://www.mayoclinic.org/drugs-supplements/diclofenac-topical-application-route/description/drg-20063434 (last visited Sept. 28, 2021).

and she had full strength in both legs. The physician noted that Plaintiff's "morbid obesity and physical deconditioning may complicate chronic pain management." She was encouraged to keep her upcoming physical therapy appointment and to "continue participation in whole health," she was instructed on the importance of a regular and consistent home exercise program and told to return to the clinic as needed. The physician also referred Plaintiff to the Interdisciplinary Pain Rehabilitation Group (Tr. 834–35), and Plaintiff once again attended an orientation session in January 2018 (Tr. 836–37, 1002–03). However, she said she was not interested in the group program or an individual appointment at the Pain Rehabilitation Center.

Plaintiff kept her appointment for a physical therapy evaluation for her bilateral knee pain on November 27, 2017 (Tr. 847-51, 1040–45). She reported that she had pain throughout her entire knee, in the front as well as the back. She also reported her knees give out and lock up. She said nothing seemed to help the pain. Previous therapy, including aquatic therapy, did not help. The therapist noted that she walked with a single point cane. On examination, she had full extension of both knees. She could bend her right knee to 90 degrees and her left knee to 104 degrees (full flexion is 140 degrees). The therapist determined that she would benefit from physical therapy to address her knee pain and planned for Plaintiff to attend biweekly appointments for up to eight weeks. There is no indication that Plaintiff ever attended any therapy sessions.

In February 2018, she had her annual physical with Dr. Truong, her physician outside the VA (Tr. 728–32). Regarding her knee pain, she told Dr. Troung that she had not had any x-rays for "several years" (even though she had x-rays five months prior in

September 2017) and "wants to readdress" because she feels her pain has continued. Dr. Truong noted that she had seen a pain management doctor and wears braces on both knees. He further noted that her gait and station were abnormal and she "uses cane to help walking." Dr. Truong ordered x-rays of her knees to ascertain if there was any osteoarthritis. He also talked to her about nutrition, aerobic exercise, weight bearing exercise, and weight loss. The x-ray of Plaintiff's right knee showed "mild arthritis" with a small amount of fluid, and the x-ray of her left knee showed small patellar spurs with a small amount of fluid (Tr. 724–27).

Plaintiff went to the emergency room on June 1, 2018 for shortness of breath, numbness, tingling, and dizziness; the note said Plaintiff had a "normal gait" (Tr. 965). A nurse practitioner's note from July 2018 when Plaintiff underwent an EKG, says "well groomed obese [patient] who ambulates well" (Tr. 950).

On August 1, 2018, Plaintiff had a physical therapy evaluation for "balance issues" (Tr. 818–24). She reported she sometimes starts spinning when she is just standing there. She also falls backwards and sideways when standing still or trying to stand up from a sitting position. The therapist recommended once weekly appointments for up to 12 weeks. Plaintiff attended sessions on August 8th and 15th (Tr. 1055–67), but then apparently stopped. At the appointment on August 15th, she said her dizziness was not getting better since she started physical therapy.

A psychiatrist's note from December 4, 2018 says Plaintiff's gait was "antalgic," and she walked with a cane (Tr. 790). But then again, Plaintiff told the psychiatrist that she and her wife had an argument the previous weekend, "which led [Plaintiff] to decide

she needed to walk away. She 'just walked' from Saturday am to Sunday pm, didn't sleep, just walked. She stopped at Walmart, a movie theater, and a couple of restaurants" (Tr. 786).

Plaintiff also attended a recreational therapy consultation in December 2018 (Tr. 1049). There is no indication that she followed through with this program.

A note from a March 1, 2019 visit to the emergency room for elevated blood pressure said Plaintiff had a "normal gait" (Tr. 954). However, a note four days later from a follow-up visit with her primary care physician at the VA says "walks with a cane and loses balance" (Tr. 946).

## ANALYSIS

Plaintiff first argues that the ALJ erred at Step 2 by failing to recognize and/or discuss Plaintiff's patellofemoral syndrome diagnosis. This argument is a non-starter. "Deciding whether impairments are severe at Step 2 is a threshold issue only; an ALJ must continue on to the remaining steps of the evaluation process as long as there exists even *one* severe impairment." *Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012) (citing *Castile v. Astrue,* 617 F.3d 923, 927–28 (7th Cir. 2010)). Here, ALJ Plucker determined that Plaintiff had multiple severe impairments at Step 2, including lumbar degenerative disc disease, knee osteoarthritis, bladder control issues, obesity, and mild hearing loss, and proceeded accordingly to the remaining steps of the analysis (Tr. 18–21). So, any error in omitting patellofemoral syndrome was harmless.

Plaintiff next argues that the ALJ erred in determining her RFC because it does not incorporate patellofemoral syndrome (Doc. 28, pp. 4, 5). While the ALJ considered her

knee osteoarthritis, Plaintiff asserts that patellofemoral syndrome is a separate diagnosis with separate symptoms. She further asserts that the diagnosis of patellofemoral syndrome required knee braces and a cane for ambulation and could, according to an article from the National Institutes of Health, interfere with her ability to sit for long periods (Doc. 28, pp. 4, 5; Tr. 49).

While true that the ALJ did not specifically mention Plaintiff's patellofemoral syndrome diagnosis, his discussion included a review of the record related to her knee issues. Specifically, the ALJ discussed Plaintiff's testimony about her knees, the multiple x-rays of her knees, the consultative examiner's impression of Plaintiff's knees in August 2017, her use of braces and a cane, medical records containing observations about her leg strength, reflexes, and gait, and the measures she has taken to treat/alleviate her pain (Tr. 22, 23, 24, 25). In other words, the ALJ might not have explicitly mentioned patellofemoral syndrome, but he accounted for the limitations that Plaintiff claims were caused by the disorder.

Plaintiff nevertheless argues that the ALJ ignored all of the evidence of patellofemoral syndrome, "which support the need for a cane for ambulation and balance and the inability to sit for long periods" (Doc. 28, p. 6). Turning first to the cane, Plaintiff takes issue with the ALJ's decision not to include the use of a cane or other assistive device in the RFC (Doc. 28, pp. 6–8; *see* Tr. 25). The ALJ noted that Plaintiff appeared at appointments with a cane and reported needing one to ambulate (Tr. 25). However, the ALJ noted there was no indication that a cane was prescribed for her and she reported that it was "self-prescribed" (Tr. 25, citing Exhibit 4F/1 (Tr. 473)). Her physical therapist

provided her with a cane when she requested one (Tr. 25, citing Exhibit 10F/140 (Tr. 872)). And medical records as recent as March 2019 indicated that she had a "normal gait" and did not mention an assistive device (Tr. 25, citing Exhibit 10F/222 (Tr. 954)).[8] The ALJ thus concluded that it was not necessary to include the use of a cane or other assistive device in the RFC; in other words, the ALJ found that a cane was not medically required. SSR 96-9p, 61 FR 34478-01, 34482 (July 2, 1996), *available at* 1996 WL 362208.

Plaintiff asserts that the ALJ ignored all of the evidence that supports the need for a cane (Doc. 28, p. 6). For example, the consultative examiner, Dr. Vittal Chapa, noted in August 2017 that Plaintiff appeared to have significant pain in the right knee when ambulating without a cane (Tr. 474). And Dr. Chapa wrote, "It appears from the examination that the claimant needs a cane for ambulation." (*Id.*). Based on Dr. Chapa's examination, the agency physicians who conducted the medical assessments at the initial level and on reconsideration, Dr. Lenore Gonzalez and Dr. Vidya Madala, both determined that "a medically required hand-held assistive device was necessary for ambulation" (Tr. 72, 82, 95, 106). And while Plaintiff's cane was initially self-prescribed, her physician sent her to a physical therapist, who issued her a new cane and showed her how to properly use it (Tr. 592–93, 872). That physical therapist described Plaintiff as walking with an "antalgic gait pattern and decreased cadence" (*Id.*). Plaintiff's physician also prescribed her knee braces. A note from the October 2017 orthopedics consultation

---

[8] To be sure, there were also plenty of other notes, aside from the one the ALJ cited to (Tr. 25, citing Exhibit 10F/222 (Tr. 954)), that said Plaintiff had a steady gait (Tr. 438), a normal gait (Tr. 564, 965), ambulates well (Tr. 950), or walked with no difficulty (Tr. 994).

indicates that Plaintiff's ambulation was "antalgic with cane, wearing bilateral bracing" (Tr. 991).

Plaintiff is correct. The Seventh Circuit has repeatedly held that "although an ALJ does not need to discuss every piece of evidence in the record, the ALJ may not analyze only the evidence supporting [his] ultimate conclusion while ignoring the evidence that undermines it." *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014). "The ALJ must confront the evidence that does not support her conclusion and explain why that evidence was rejected." *Id. See also Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003) ("In assessing a plaintiff's RFC, an ALJ must consider all relevant evidence in the case record and evaluate the record fairly."). Here, the ALJ did not acknowledge any of the evidence that contradicted his conclusion that Plaintiff did not need a cane to ambulate. He needed to not only acknowledge it but also explain why it was outweighed by the other notes that indicated Plaintiff had no gait abnormalities.

In sum, a reasonable mind evaluating the entire record would not accept the ALJ's stated reasons for rejecting Plaintiff's need for a cane as "substantial." And because the ALJ specifically rejected the proposition that Plaintiff needed a cane to walk, the ALJ did not include a cane or assistive device in his hypotheticals to the vocational expert. The Court thus has no way to know whether a cane would have precluded Plaintiff from maintaining employment.

Turning next to the issue of sitting, the ALJ found that Plaintiff was capable of sedentary work, (Tr. 21–22), in which sitting would generally total about six hours of an eight-hour workday. SSR 96-9p, 61 FR 34478-01, 34480 (July 2, 1996), *available at* 1996 WL

362208. Plaintiff points out that she testified she cannot sit for long periods of time (Doc. 28, p. 5; Tr. 49). The ALJ, however, never acknowledged Plaintiff's testimony (*see* Tr. 21–26). The ALJ simply accepted the opinions of the agency physicians who conducted the medical assessments at the initial level and on reconsideration (Dr. Lenore Gonzalez and Dr. Vidya Madala), that Plaintiff was capable of sitting for six hours in an eight-hour shift, without any discussion whatsoever (*see* Tr. 21–26; *see also* Tr. 72, 82, 95, 106). The ALJ cannot simply ignore a claimant's testimony. The ALJ was required to explain why Plaintiff's testimony could not be accepted. *Schmidt v. Barnhart*, 395 F.3d 737, 746–47 (7th Cir. 2005) (an ALJ is required "to articulate specific reasons for discounting a claimant's testimony as being less than credible" and is precluded from "merely ignoring" the testimony . . . ."). As the Commissioner points out, there are certainly reasons that Plaintiff's testimony could be discredited (Doc. 32, pp. 9–10). But it was incumbent on the ALJ to provide those reasons in the first place. *See Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) ("[T]he *Chenery* doctrine . . . forbids an agency's lawyers to defend the agency's decision on grounds that the agency itself had not embraced.") (citing *SEC v. Chenery Corp.,* 318 U.S. 80, 87–88 (1943)). *Accord Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011) ("We have made clear that what matters are the reasons articulated *by the ALJ.*") (emphasis in original). This mistake requires remand because as Plaintiff argued, if she cannot sit for long periods, then she cannot maintain sedentary work and she would meet the requirements for disability.

As for Plaintiff's ability to balance, the ALJ noted that the agency physician who conducted the medical assessment at the initial level, Dr. Gonzalez, opined that Plaintiff

could occasionally balance, while the agency physician who conducted the medical assessment on reconsideration, Dr. Madala, said Plaintiff could never balance (Tr. 25, 26; *see also* Tr. 72, 83, 95, 106). As an initial matter, the ALJ was mistaken about Dr. Madala's opinion—Dr. Madala did not say Plaintiff could never balance; Dr. Madala said Plaintiff could occasionally balance (Tr. 95, 106). At any rate, the ALJ accepted the opinion that Plaintiff could balance occasionally without considering all of the relevant evidence in the record. Specifically, Plaintiff testified that she was constantly losing her balance, and the medical records show she began attending physical therapy in August 2018 for balance issues. These medical records were not available to either Dr. Gonzalez or Dr. Madala at the time they issued their determinations. Therefore, it was obviously important for the ALJ to consider these medical records, as well as Plaintiff's testimony, and to explain why they did or did not change his view of Dr. Gonzalez and Dr. Madala's opinions regarding Plaintiff's ability to balance. But the ALJ never mentioned these medical records or Plaintiff's allegations regarding her balance (*see* Tr. 21–26).

In sum, the ALJ failed to consider all relevant evidence in the case record when considering Plaintiff's ability to sit for long periods of time, her ability to balance, and her need to use a cane. These errors had a material effect on the ALJ's assessments of the Plaintiff's limitations and her residual functional capacity, and therefore require reversal. The Court wants to emphasize, however, that this Order should not be construed as an indication that it believes the ALJ was required to reach a certain conclusion about Plaintiff's limitations, or that Plaintiff is entitled to benefits. On the contrary, the Court has not formed any opinions in that regard and leaves those issues to be determined by

the Commissioner after further proceedings. The ALJ's decision is being reversed because he failed to address all of the evidence and support his findings with substantial evidence.

<u>C</u>ONCLUSION

The Commissioner's final decision denying Plaintiff Shawntel M. J.'s applications for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of Plaintiff.

**IT IS SO ORDERED.**

**DATED: September 30, 2021**

s/ Mark A. Beatty
**MARK A. BEATTY**
**United States Magistrate Judge**